EXHIBIT D

VOLUME I
PAGES: 1 - 86
EXHIBITS: 1 - 14

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11925 NG

GEORGE MICHAEL DOWD,
Plaintiff,

v.

JAMES DOWD,
Defendant.

DEPOSITION OF GEORGE MICHAEL DOWD, taken on behalf of the Defendant, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Ariane L. Baker, Certified Shorthand Reporter and Notary Public within and for the Commonwealth of Massachusetts, at Lovins & Metcalf, Ten Cedar Street, Woburn, Massachusetts, on Thursday, December 1, 2005, commencing at 9:53 a.m.

**MELVIN LIPMAN**
101 Tremont Street
Boston, Massachusetts 02108
617-227-3985

**APPEARANCES:**

NELSON P. LOVINS, ESQUIRE
Lovins & Metcalf
Ten Cedar Street
Woburn, Massachusetts 01801
781-938-8800
Counsel on Behalf of the Defendant

DAMON SCARANO, ESQUIRE
Law Office of Damon Scarano
60 Commercial Wharf
Boston, Massachusetts 02110
617-723-4572
Counsel on Behalf of the Plaintiff

ALSO PRESENT:
Karen Dowd

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| GEORGE MICHAEL DOWD | | | |
| (By Mr. Lovins) | 5 | | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 11 |
| 2 | Suggestion of Death | 11 |
| 3 | Motion to Substitute Administrator and to file Amended Complaint | 11 |
| 4 | Photocopy of Business Card - Notice of Petition for Appointment of Administrator | 14 |
| 5 | Letter dated March 4, 2005 to Nelson Lovins from Charles A. Katsenes - Inventory | 15 |
| 6 | Administration without Sureties | 32 |
| 7 | Bond of Administrator | 35 |
| 8 | Voluntary Administration | 36 |
| 9 | Standard Certificate of Death | 38 |
| 10 | Standard Form - Purchase and Sale Agreement | 38 |
| 11 | Complaint - Plaintiff demands a trial by jury to all issues at Law & Equity | 66 |
| 12 | Answer Counterclaim and Jury Demand | 69 |
| 13 | George Michael Dowd's Answer to the Defendant's Counterclaim | 75 |
| 14 | Full and General Release | 75 |

He said, Well, you know, can he have -- what do you call money when I croak -- inheritance?

I said, Well, let me think about it. So finally I told him -- I said, you know, I'd knock off 200,000 for him. He could have the purchase of the house for 450,000. Again, the whole stipulation -- He said to me he always wanted to own this house. I told him -- I said, All right. If you sell the house within two years, you owe me an additional 50,000.

When he come out to his figures, he said, Dad, I can't come up with the whole 450,000. He said, I can if I involve -- at the time, it was his girlfriend or fiance, whatever. He said, if I involve her -- she's got plenty of money -- I can get it. I'd rather do it on my own.

I said, All right. I'll loan you the money. So I basically loaned him 30,000, and he come up with 420 at passing.

Within six months or less, he not only sold the house, but he sold it to Steven Devane, who wanted to buy it from me. And, guaranteed, he's not showing the full amount on paper because I'll guarantee there's a separate loan on there. It's no different than when Steven asked me to hold a separate one. I'm sure, you

know, grabbing records, we could find out.

Steven also told me at that time that if I sold to him, I could have kept the garage for two years, which means -- I left an awful lot of tools and stuff in there, over $20,000 worth. With James buying the house, I thought they were safe, but then he sold it. So I've lost that in addition.

Q. Okay. So have you now told me all of the events that led up and relate to the sale of this house?

A. Let me see if I left anything out. Well, I think that's the basic bulk of it anyway. Yes.

Q. Am I correct, sir -- strike that.

Is there any written documentation which reflects this $30,000 loan?

A. No.

Q. Is there any written documentation which reflects the arrangement that you are alleging with your son concerning the $50,000?

A. No.

Q. Did the arrangement with your son concerning the $50,000 have anything to do with the price for which he would have sold it or was it strictly a question of the time period within which he was to sell it?

A. It had to do with the time period because I

could have got 650,000, and I was taking it off strictly to do him a favor and help him out. And if he was to sell it -- because he's a very greedy person -- I knew that he was going to make plenty of money on it, so I wanted 50,000 more.

Q. So let me ask you this question: With regard to the $50,000 -- I took some notes while you were talking -- you said that if you, meaning Jim, sell the house in two years, you owe me an additional 50,000?

A. That is correct.

Q. Is that the entire deal?

A. Yes.

Q. What if he -- Did you and he ever talk about what would happen if he sold the house for less than what he bought it from you for, plus a figure of -- In other words, suppose he didn't make a $50,000 profit, how would that have factored into the agreement?

A. As a matter of fact, he sold it to the person that wanted to buy it from me at 650,000. I know he made that profit. I also know that person was trying to hide some of the money. So I don't believe it appears on one piece of paper. I believe there's more than one out there.

Q. Have you and -- Is it Mr. Devane? Is that

his name, Steven Devane? Is that his name?

A. Devane or something like that.

Q. Devane?

A. Yeah.

Q. Have you and Mr. Devane had any conversations since the time that he bought the property from your son?

A. No.

Q. Do you know whether your attorney has had any conversations with him?

A. No. Not with Mr. Devane, no.

Q. You don't know or he hasn't?

A. He hasn't. I don't think he even knows his name.

Q. Okay. When did your son tell you that he was $30,000 short?

A. Approximately, three or four days before we passed papers.

Q. So are you saying that your agreement with your son was you were to sell the house to him for $450,000?

A. Correct.

Q. Okay. Now, you realize, sir, that on Exhibit Number 10, which is the Purchase and Sale

Agreement, that that document reflects the sales price of $420,000; is that right?

A. That's correct.

Q. Is there some reason why you didn't ask for this document to reflect that it was 450,000 with a reference to a $30,000 loan?

A. Yeah, because he wouldn't have got the loan if they knew that he owed that kind of money. So I told him, All right. It was between he and I. He did not want his girl involved in the sale.

Q. Now, you say he would not have gotten the loan. Did he, in fact, get a mortgage for this property?

A. At that time, yes, on that 370,000.

Q. For the purchase of that property?

A. Yes.

Q. Do you know who he got the mortgage from?

A. No, I don't.

Q. Now, you referred to the fact that he didn't want to have his girl involved. What did you mean by that?

A. Well, he was living with a lady for over five years. She owns a townhouse that they live in and all that. She has plenty of money. She got hurt in an





accident one time. He just didn't want her name on the title.

Q. You mean the title of 47 Mallard Way?

A. Correct.

Q. Well, what did his desire to keep her name off the title -- what did that have to do with the $30,000 loan?

A. Because I agreed to let him owe me the money. He had a house that he and a friend of his, Dave, had been working on to resell. He said he'd pay me the minute they sold that house. They obviously -- Well, I couldn't tell you if they've sold it since, but I'm sure they did.

Q. So what does any of that have to do with the fact that he didn't want his girlfriend's name on the title?

A. I have no idea.

Q. But you did say that. I'm just sort of wondering --

A. I'm telling you what he told me. He wanted the title in his name cleared, not his girl's.

Q. You didn't understand what relationship that had to do with anything?

A. Let me tell you, James is the type that





doesn't have a relationship with anybody but himself.

Q. Going back to the agreement that you made with James about the sale within a two-year period, your deal was that you were going to sell it to him for $450,000, correct?

A. After I gave him the 200,000 off, yes.

Q. Okay. And then you say that you told him that if he sold it in two years, you wanted a $50,000 -- you wanted $50,000?

A. Correct.

Q. Okay. But is it correct, sir, that you and he never talked about what would happen if he sold it for less than $450,000?

A. That's correct. That, we never talked about. But I also know that he didn't sell it for less.

Q. My only question is, when you made the deal for $450,000 and you told him that you'd do it if he gave you $50,000 on a sale within two years, you never talked about what would happen if he sold it for less than $450,000?

A. No, because he should have talked to me because I could have got that money. It's no different than I could have in the beginning.

Q. Let me ask you this question: You'd agree





with me that 450 plus 50 is 500?

A. Yes.

Q. Did you and he ever talk about what would happen if he sold it for less than $500,000?

A. No, we didn't.

Q. Did you and he ever talk about when that two-year period was supposed to begin running?

A. Should be from the date of purchase, which is approximately December 17th, in that area.

Q. The date of the title passing?

A. Yes.

Q. Not the date of the Purchase and Sale Agreement?

A. Right.

Q. And when was it your understanding that the two-year period would end?

A. Two years from that date.

Q. Well, would the two years run from the date of the Purchase and Sale Agreement for a new buyer or the date that the new buyer actually took title?

A. I would say from the time he found another buyer.

Q. But you and he never talked about it?

A. No, we didn't. Never thought it would be

Q. Is he working?

A. He works for the school department, but he only makes eight something an hour.

Q. Does he have any medical problems?

A. Yes, he does.

Q. What are those?

A. He's going in for a gallbladder operation in January, and he's had a heart condition just recently.

Q. How old is he?

A. He'd be 61.

Q. And he's presently working; is that right?

A. School department, yes, janitorial services.

Q. So are you saying that William was actually a witness to the conversation where you told your son you wanted $50,000 if the property --

A. Yes, he was.

Q. -- was sold in two years?

A. Yes, he was.

Q. Was anybody a witness to the conversation relative to the $30,000 loan?

A. I don't believe so, no.

Q. Okay. Let me ask you about that conversation, sir. Did you say that the conversation about the $30,000 occurred shortly before James took

title to the property?

A. Correct.

Q. And when was -- According to your conversation, did you put any time frame on the repayment of the loan?

A. The time frame was that him and his friend Dave were doing over a house that they were -- that they purchased in Dave's name. They were fixing it up and selling it for a resale. And when they sold the house, he was going to pay me.

Q. What's Dave's last name?

A. I have it at home. I don't have it with me. I might think of it as this goes on. If I do, I'll jump in and tell you.

Q. And where is that house that you're talking about?

A. I don't know. Newton is all I know.

Q. Do you know whether or not the house has, in fact, been sold?

A. No, I don't.

Q. Now, you made some reference to the fact that John and/or Jim, in trying to get you to sell the house for less than 650, made some reference to an inheritance. Do you recall that?

A. Yes.

Q. Can you tell me more specifically what it was that they said?

A. Yes. It started that John come to me and said, Dad, James has always wanted this house all his life. Can you help him? Is there any way that you can, you know, give him inheritance money towards it or anything of that nature?

I said, Let me think about it. So, I mean, that was probably a month or so before. I did think about it, and my decision was that I would take off $200,000, which made it very hard for me because now I had to figure out how, in later life, I was going to be able to do the same for John, because if you do for one, you have to do for the other.

Q. Do you recall, sir, that the day before your wife passed away there was some conversation that you and your two sons and your wife were present at where there was a discussion about the 401(k)?

A. There was never a discussion in front of my wife about the 401(k). Number 2, there was no recollection, in my mind, whatsoever that she was close to death at that time. So there was no talk of that.

She called me up at work on a Thursday and

said that she was in a lot of pain and she wanted to go into the hospital. I'll probably have to pay for the ambulance because the doctor wasn't recommending it. It was her own decision. There was no talk of death.

Q. That was on a Thursday. How much earlier was -- How much prior in time was that to her passing?

A. Saturday.

Q. All right. There was no discussion --

A. None.

Q. -- about the 401(k)?

A. No.

Q. Was there any discussion about how the 401(k) was to be distributed, at any time, between you and your wife?

A. Yeah. Just the way it's on there. My name. That I would know what to do when I did it.

Q. And when you say that you would know what to do, she said that to you?

A. Yes.

Q. And when was that said to you?

A. Quite a while before her death. It was nowhere close, because I told you I didn't know she was close.

Q. And when she said to you, You would know what

A. No. If he sold it, he owed me because I could have made the profit.

Q. But that was in your mind?

A. Yes.

Q. Okay. Now, the next question is, sir, do you have any information, either through any documents or from anyone you've spoken to -- do you have any information that your son James Dowd made any profit on the sale at all?

A. No.

Q. Have you ever -- And do you know that the property has been sold to Mr. Steven Devane?

A. Yes, I do.

Q. And have you ever seen the deed?

A. No.

Q. Do you know how much the deed reflects the property was sold for?

A. No, but I also know that Steven was looking for a second mortgage. So I do know that it won't all be on one deed.

MR. LOVINS: Mark this as the next exhibit.

(Exhibit No. 12 marked for identification.)

BY MR. LOVINS:

Q. Placing before you now, Mr. Dowd, what has been marked as Exhibit Number 12, do you see that that is titled Answer Counterclaim and Jury Demand?

A. (Witness reviewing document.) Yes.

Q. And would you turn to the third page -- the pages are not numbered, but it is the third page -- and you see about a quarter of the way down the title Counterclaim?

A. Yes.

Q. And do you understand that this is a claim that your son is making against you?

A. I understand.

Q. Okay. Would you look, sir, at Paragraph Number 5 --

A. Um-huh.

Q. -- which reads as follows, and tell me if I've read it correctly: Before her death -- referring to Carol Ann Dowd -- Carol expressed her wish that her two sons would receive the proceeds of her 401(k) plan, approximately 141,000, in equal shares. George agreed to see to this distribution. And on reliance of that promise, Carol did not formally alter the designated beneficiaries of the 401(k) plan.

What do you have to say about that?

A. I've got to say the whole thing is false. Carol and I never talked about the boys having it. It was in my name because she felt it should be in my name. She only got to save that money because she lived under my roof, and I'm the one that had to put that money away. James would like to get his hands on some more money from me. The $200,000, he was too greedy to accept that as enough, so he had to steal the 80. And he'd still go after anything else he could. He's a greedy slob.

Q. Now, Mr. Dowd, why do you say that your former wife lived under your roof? Wasn't that a house that you and she owned together?

A. Yeah. She made ten dollars an hour. I made thirty dollars an hour.

Q. All right. Do you think, when you say that she was living under your roof, that you were doing her some kind of favor?

A. No. We're doing each other a favor.

Q. Okay. So I'm just curious as to why you said that she was living under your --

A. Just that I paid all the bills, all the bills for thirty-eight years. I wrote every check that was

ever sent out. I bought the cars. I paid the car insurance. I paid everything. Her money that she made -- Her ten dollars an hour was to spend any way that she wanted. And when the boys were younger, she had put them through a parochial school with it. But she never turned in her checks to our household money. I paid for everything.

Q. Did you have a pension or retirement fund, sir?

A. No, I don't.

Q. But at the end of the day, she ended up with $140,000 retirement fund, didn't she?

A. Yeah. After 21 years, yeah.

Q. And what kind of work did you do?

A. Mechanic.

Q. And were you --

A. Mainly, I was a supervisor.

Q. A what?

A. Supervisor.

Q. For whom?

A. Butler Aviation, I was their maintenance manager. Railroad Equipment Rental, I was their maintenance manager. Coca-Cola Bottling Company, I was their maintenance manager. I was in management most of